## Tussey, et al. v. Grone's Administrator, et al.

(Decided December 6, 1921.)

Appeal from Boyd Circuit Court.

1. Evidence—Deeds—Cancellation—Evidence of Mental Incapacity Admissible on Question of Undue Influence.—While a deed will not be cancelled for mental incapacity unless pleaded, yet as a person of feeble understanding is not as able to withstand the artifices, importunities and dominion of another as a person of common understanding, evidence of mental incapacity is admissible on the question of undue influence.

2. Deeds—Cancellation—Fraud and Undue Influence—Sufficiency of Evidence.—Evidence in an action to set aside a deed on the ground of fraud and undue influence held sufficient to sustain the finding in favor of plaintiffs.

ROBERT T CALDWELL and H. R. DYSÁRD for appellants.

PRITCHARD & MAILIN and B. S. WILSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

In the year 1914 Sophia Grone was the owner of a house and lot in the city of Ashland, on which there was a past due mortgage of $1,250.00 and a lien for street assessments amounting, with interest, to about $700.00 more. On January 22nd of that year Sophia conveyed the property to J. B. Tussey. The recited consideration was $2,500.00 cash, the assumption of the mortgage and the street assessments, and the agreement that the first party was "to have and to enjoy the use of said property as a home during her lifetime, said property, however, being subject to the control of second party."

In the year 1917 the grantor, Sophia Grone, brought suit to cancel the deed on the ground of fraud, alleging in substance that she was a lone woman with no one to look after her property interests except herself, and that defendant having won her confidence, she, on or about January 22, 1914, entered into a contract with defendant, by the terms of which the defendant agreed to pay off the mortgage on her property, amounting to $1,250.00, and street assessments against the property, amounting to something over $500.00, and some other small amounts, "and agreed to keep the house and property in good repair and pay all expenses during her lifetime, and at her death that said property under said contract was to become the property

of said defendant." She further alleged that the defendant, with the assistance of his brother, a practicing attorney, had fraudulently procured her to execute a deed conveying him the property subject to her life estate, the acts constituting the fraud being set up as follows:

"Defendant procured her to execute said deed by fraudulent and false representations and stating to her that it was a mere contract which she had entered into with said defendant and plaintiff, and relying on said representation of defendant, did execute and deliver said deed to defendant there at that time believing it to be such contract and for no other purpose whatever."

The petition contained the further allegation that no part of the cash consideration had been paid, and the defendant had failed to discharge any of the indebtedness on the property.

No further steps were taken in the case until Sophia Grone's death, which occurred a few months later. Thereupon the action was revived in the name of her administrator and heirs, who filed an amended petition pleading fraud and undue influence, and alleging in substance that Tussey won the confidence and affection of Sophia Grone, and by his fraudulent representations led her to believe that he was in love with her and would marry her, that by reason of his false and pretended affection and love for her he won her confidence and affection to such an extent that he was able to control her will absolutely, and by reason thereof she was induced to make the promises and agreements stated in the petition which she would not have made had it not been for his fraudulent representations and overtures of affection, devotion and love. Judgment was rendered cancelling the deed and Tussey and wife appeal.

It appears that after the death of Sophia Grone's parents, she and her sister, Mary Grone, and her brother, Charles Grone, occupied the homestead in Ashland. Charles Grone acquired title to the property, and upon his death in 1908, he left a will devising that and other property to Sophia. Sophia had the homestead torn down and a house containing nine or ten rooms erected on the lot with the proceeds of the personal property which she received from her brother Charles. She and her brothers and sisters and their families were not on very friendly terms because of a contest which they instituted over the will of their brother Charles. Sophia maintained herself by renting out rooms. It does not

appear that she had more than four to six roomers at a time, and they paid on an average about $3.00 apiece. In the year 1909 Tussey, then a young man twenty-one years of age, came to Ashland to work for the C. & O. Railroad as brakeman, and secured a room in Sophia's house. Though about twenty years his senior, Sophia seems to have taken a great interest in Tussey. She appeared anxious to please him and occasionally furnished him his meals, though she did not furnish any meals to other roomers. He sometimes addressed her as "Hon," "Sweetheart" and "Dearie," and would romp with her and put his arm around her. When out on the road he would occasionally send her postal cards containing pictures or verses suggestive of affection, and in which he would address her in endearing terms. Two or three witnesses say that Sophia told them that she and Burt were going to get married. One witness says that they acted like sweethearts, and that Tussey told her that they were going to get married. Tussey himself says that there was no suggestion of marriage between them, but, on the contrary, Sophia merely took a motherly interest in him. There is evidence that Tussey had a sweetheart to whom he was devoted about the time the deed was made, but that she died. About two years after the execution of the deed he married and brought his wife to the house. It appears that Sophia was jealous of his first sweetheart and made certain remarks about her for which she threatened to bring a suit 'for slander. The matter was compromised by Sophia's paying the girl $100.00, and the compromise was brought about by Tussey. There is also evidence that Sophia was jealous of Tussey's wife, and did not like her. Several witnesses say that Sophia had only the mind of a child, one witness deposing that she impressed him as being "half nutty." On the other hand a number of witnesses say that Sophia had a good average mind, and knew perfectly well how to manage her business and take care of herself. Other witnesses say that Sophia told them that she was too old for Burt and would be glad for him to find some nice girl who would make him a good wife. In addition to this, there are circumstances from which it may be inferred that Sophia was being pressed to. pay the outstanding mortgage and the street assessments.

As to the payment of the cash consideration, Tussey deposes that, beginning in 1910, he advanced to Sophia

money from time to time, and that the sums so advanced amounted to about $2,500.00, but exactly how much he could not say. Another witness said that he had seen Tussey pay Sophia money in sums of from $50.00 to $75.00 as many as ten times, and that this occurred a few months before the execution of the deed. Another witness says he was trying to sell Tussey a machine and was present when Tussey and Sophia were considering the matter. He understood from the conversation that Sophia had about $750.00 of Tussey's money, and she advised against the purchase. Still another witness testified that Sophia had stated to him that she did not know what she would have done if Tussey had not advanced her money. On the other hand it appears that Sophia had only about $50.00 in cash when she died, and this sum was in bank. Her bank account does not show the deposit of any substantial sum of money at the time it is claimed that the money was advanced. It was also shown that Sophia was very economical, dressed very plainly and indulged in no luxuries of any kind.

Counsel for appellants insists with much earnestness that the evidence is insufficient to sustain the finding of the chancellor and presents in substance the following argument: Evidence of mental incapacity was not admissible because mental incapacity was not relied on as a ground for cancellation. The only fraud relied on by Sophia Grone in her lifetime was the claim that she was induced to sign a deed instead of a contract having the same legal effect. This did not constitute fraud in law and was not available as a ground for cancellation for the further reason that Sophia subsequently executed the mortgage to Leffingwell, which referred to the deed which she had made to Tussey. Upon the death of Sophia, her heirs abandoned the only ground which she relied on for cancelling the deed, and alleged undue influence and fraud. The fraud relied on was that she conveyed the property to Tussey in consideration of his promise to marry her. The evidence fails to show such a promise. There was substantial evidence that the cash consideration was fully paid, but even if it was not paid, Sophia's expectancy in the property amounted to about 60 65/100%, thus leaving the remainder worth 34 35/100%, or about $1,715.50, as the property was worth about $5,000.00. In consideration of an interest worth this amount, Tussey agreed to assume a mortgage of $1,250, and street assessments of over $500.00, which was

substantially the full value of the property. That being true, the transaction was fair, and there is no reason why the deed should be set aside.

While it is true that a deed will not be cancelled for mental incapacity unless pleaded, yet, inasmuch as a person of feeble understanding is not as able to withstand the artifices, importunities and dominion of another as a person of common understanding, it is well settled that evidence of mental incapacity is admissible on the question of undue influence. Somes v. Skinner, 16 Mass. (Tyng) 348.

The property in question was worth about $5,000.00, and if it had been shown by satisfactory evidence that the cash consideration had been paid, it is clear that the grantor would have received the full consideration for the property, and there would be no ground on which to cancel the deed. But the evidence that the cash consideration was actually paid is by no means persuasive. It is not probable that Tussey would have advanced sums in sufficient amount to aggregate $2,500.00 without taking some evidence of the indebtedness. The witness who claims to have seen Tussey pay several sums, of from $50.00 to $75.00 each, to Sophia, is not clear as to the amounts paid or the purpose for which they were paid. The witness who attempted to sell the machine merely gathered from the conversation that occurred between Tussey and Sophia that she had a considerable sum of money belonging to Tussey. However, he states no facts justifying this impression. It does not appear that she had such a sum in bank, and it is not probable that she had such a large amount around the house. On the other hand, the circumstance that she lived very economically and spent but little strongly tends to show that no sums were advanced unless for the purpose of paying Tussey's board. Eliminating, then, the cash consideration, we find that the house was conveyed to Tussey in consideration of his assuming the lien indebtedness, amounting to about two-fifths of its value, and for which the property itself was liable. The only consideration, therefore, which Sophia was to receive was the right to enjoy the property as a home during her lifetime subject to the control of the property by Tussey. In view of the fact that Sophia had merely a home in the property for a lifetime, and the property was to be controlled by Tussey, the estate which she reserved was not a life estate in the entire property, but a mere right to occupy only such portions of it as

were reasonably necessary for the purposes of a home. That being true, it cannot be said that the estate which Sophia reserved was worth anything like the amount claimed by counsel for appellants.

While it may be true that the evidence does not clearly establish that Sophia conveyed the property to Tussey in consideration of his promise to marry her, there can be no doubt that she had a deep affection for him, even if she was not actually in love with him. This is shown not only by many years of devotion and by unusual manifestations of affection in the presence of others, but by her jealousy of Tussey's former sweetheart and of his wife after they were married. Furthermore, her entire confidence in Tussey is shown by the fact that when his sweetheart threatened to sue her for slander, she entrusted him with the settlement of the matter. And even if the evidence does not show that Sophia was of feeble understanding, it does show that she was a simple-minded, confiding woman of less than average intelligence. Viewing the transaction in the light of the fact that the deed recites a cash consideration, which was not paid, which is of itself a badge of fraud, and of the further fact that a simple-minded woman, for a plainly inadequate consideration, conveyed all of her property to a young man who lived in the same household and enjoyed her confidence and affection, upon terms which were advantageous to him, and which might prove very disastrous to her if he failed to discharge an assumed lien on the premises, we conclude that the circumstances are such as to raise a strong presumption of fraud and undue influence, which presumption has not been overcome by satisfactory evidence. That being true, we see no reason to disturb the finding of the chancellor.

Judgment affirmed.